AO 93 (Rev. 01/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Northern Mariana Islands

FILED
Clerk
District Court

MAY – 1 2013

for the Northern Mariana Islands
By_____
(Deputy Clerk)

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The business establishment of TINIAN DYNASTY HOTEL and CASINO located at One Broadway, Tinian, Commonwealth of the Northern Mariana Islands (more particularly described in Attachment A, which is incorporated herein) | )<br>)<br>)<br>)  Case No.  MC  13.-00013<br>)<br>)<br>)<br>) |

FILED
Clerk
District Court

JAN 12 2021

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ ----- _____ District of ___Northern Mariana Islands___
*(identify the person or describe the property to be searched and give its location)*:

The business establishment of TINIAN DYNASTY HOTEL and CASINO located at One Broadway, Tinian, Commonwealth of the Northern Mariana Islands (more particularly described in Attachment A, which is incorporated herein).

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: Evidence related to violations of 18 U.S.C. §§ 371 and 2; and 31 U.S.C. §§ 5313, 5324(a)(1), and (d)(2) (more particularly described in the attached affidavit of Todd Peterson as well as Attachments A & B, which are incorporated herein)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before   4/29/2013
                                                                *(not to exceed 10 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge

_____ .
                *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
                                                    ☐until, the facts justifying, the later specific date of _____ .

Date and time issued:   4/19/2013  1:41 pm _____    _____
                                                                                            *Judge's signature*

City and state:  Saipan, NMI _____    RAMONA V. MANGLONA, Chief Judge
                                                                                    *Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>MC 13 - 0013 | Date and time warrant executed:<br>APRIL 25 2013    9:50Am | Copy of warrant and inventory left with:<br>THOMAS LIU |

Inventory made in the presence of :
THOMAS LIU

Inventory of the property taken and name of any person(s) seized:

SEE ATTACHMENT

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: MAY 1, 2013

_____
Executing officer's signature

TODD PETERSON    SPECIAL AGENT
Printed name and title

# Inventory Listing of All Items Seized at Search Warrant Site

**Site Name:**
Tinian Dynasty Casino

Tinian Island

**Investigation Number:**
1000247980
**Starting Date and Time:**
04/25/2013 09:50 AM
**Ending Date and Time:**
04/25/2013 06:42 PM

**Report Date:**
Wednesday, April 24, 2013

| | | | |
|---|---|---|---|
| **Control #:** | 1 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Top Drawer | | |
| **Description:** | Seized per Warrant   Bank Inforrmation P/O in file folder labled Accts Dept | | |

| | | | |
|---|---|---|---|
| **Control #:** | 2 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Cabinet Top Drawer | | |
| **Description:** | Seized per Warrant   Forex Encasement file folder | | |

| | | | |
|---|---|---|---|
| **Control #:** | 3 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Self BU | | |
| **Description:** | Seized per Warrant   Player # with photo copy of passport ID | | |

| | | | |
|---|---|---|---|
| **Control #:** | 4 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Top Drawer | | |
| **Description:** | Seized per Warrant   Identification information - handwritten notes<br>money launderin pep folder<br>satish launch name passport page<br>Dacom system | | |

| | | | |
|---|---|---|---|
| **Control #:** | 5 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Drawer Safe B-3, Drawer 2 | | |
| **Description:** | Seized per Warrant | Casino LIcense, Bulk coin record, manual CPV issue record; business licensess; loan agreement; bank receipt - 12-5-06; bank receipt 1/16/2010, Dishoonored check record 12/18/2010-4/30/2010 | |

| | | | |
|---|---|---|---|
| **Control #:** | 6 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Drawer 1 | | |
| **Description:** | Seized per Warrant | Foreign Currency Charge Feb 2013 - April 2013 | |

| | | | |
|---|---|---|---|
| **Control #:** | 7 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Top Drawer | | |
| **Description:** | Seized per Warrant | Cage meeting folder; TDHC cage family org chart; Department meeting correspondence | |

| | | | |
|---|---|---|---|
| **Control #:** | 8 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Shelf | | |
| **Description:** | Seized per Warrant | Check Records of Player deposits | |

| | | | |
|---|---|---|---|
| **Control #:** | 9 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Shelf | | |
| **Description:** | Seized per Warrant | Disbursement vouchers | |

| | | | |
|---|---|---|---|
| **Control #:** | 10 | **Evidence Box:** | 1 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Shelf on Blk | | |
| **Description:** | Seized per Warrant | Local N/N Promotions<br>ID Player name + Player ID | |

**Control #:**  11                                                   **Evidence Box:**  1
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Small shelf, Top Shelf
**Description:**  Seized per Warrant    Instructions for setting the account of Kato Yoshihiro

---

**Control #:**  12                                                   **Evidence Box:**  1
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Safe; Shelf 4
**Description:**  Seized per Warrant    Promissary notes + loan agreements 2011 - Present, receipts offunds from 2008 - Present

---

**Control #:**  13                                                   **Evidence Box:**  2
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Bottom Drawer #4
**Description:**  Seized per Warrant    Box Dacom back up tapes
Log Bank of Guam cks issued
Bank of Hong Kong Entertainment Blank Chks

---

**Control #:**  14                                                   **Evidence Box:**  2
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Shelf
**Description:**  Seized per Warrant    Cage Daily Attendance Record

---

**Control #:**  15                                                   **Evidence Box:**  2
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Shelf
**Description:**  Seized per Warrant    Gaming tax records

---

**Control #:**  16                                                   **Evidence Box:**  2
**Location:**  Ext Cash cage                                        **Locator Code:**
b
b
**Found:**  Shelf B11
**Description:**  Seized per Warrant    Final master Games Reports

| | | | | |
|---|---|---|---|---|
| **Control #:** | 17 | | **Evidence Box:** | 2 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Shelf B11 | | | |
| **Description:** | Seized per Warrant | Bank Deposit Register | | |

| | | | | |
|---|---|---|---|---|
| **Control #:** | 18 | | **Evidence Box:** | 2 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Shelf B11 | | | |
| **Description:** | Seized per Warrant | Cashier Transaction (CTR) 1.13 Directs the CTR to be filed | | |

| | | | | |
|---|---|---|---|---|
| **Control #:** | 19 | | **Evidence Box:** | 3 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Drawer 3 B2 | | | |
| **Description:** | Seized per Warrant | Delcon, Jamie Ply #2532 folder Palacios, Norman Ply # 1193 folder Kono, Rovert Ply 1056 sheets Soo, Lee Kyung redeemed cks Fat, Wong Yiu redeemed cks | | |

| | | | | |
|---|---|---|---|---|
| **Control #:** | 20 | | **Evidence Box:** | 3 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | On wall behind B-5 | | | |
| **Description:** | Seized per Warrant | Emuol requesting package price, Finance and count department and procedures Policy for issuing casino checks, Bank account numbers, Business Licences | | |

| | | | | |
|---|---|---|---|---|
| **Control #:** | 21 | | **Evidence Box:** | 3 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Shelf B11 | | | |
| **Description:** | Seized per Warrant | Credit authorizations | | |

| | | | | |
|---|---|---|---|---|
| **Control #:** | 22 | | **Evidence Box:** | 3 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Small shelf behind B-5, fourth shelf | | | |
| **Description:** | Seized per Warrant | Company email address list 11/26/2012 - 2/14/2013 Log book | | |

| **Control #:** | 23 | **Evidence Box:** | 3 |
|---|---|---|---|
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Small shelf behind B5, 1st shelf | | |
| **Description:** | Seized per Warrant    Pink Folder containing Loan Agreement + CTTC | | |

| **Control #:** | 24 | **Evidence Box:** | 3 |
|---|---|---|---|
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant    Direct Deposit Records | | |

| **Control #:** | 25 | **Evidence Box:** | 3 |
|---|---|---|---|
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant    Junket Operations | | |

| **Control #:** | 26 | **Evidence Box:** | 3 |
|---|---|---|---|
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant    20K/10K Program | | |

| **Control #:** | 27 | **Evidence Box:** | 4 |
|---|---|---|---|
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Back of Desk M3 | | |
| **Description:** | Seized per Warrant    VIP customer information Photo 334 | | |

| **Control #:** | 28 | **Evidence Box:** | 4 |
|---|---|---|---|
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Back of desk M2 | | |
| **Description:** | Seized per Warrant    VIP customer information Photo #235 | | |

| **Control #:** | 29 | **Evidence Box:** | 4 |
|---|---|---|---|
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Desk Drawer M1 | | |
| **Description:** | Seized per Warrant    VIP customer reservations Photo #236 | | |

| | | | |
|---|---|---|---|
| **Control #:** | 30 | **Evidence Box:** | 4 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Back of Desk Area M3 | | |
| **Description:** | Seized per Warrant | Blank FINCEN 105 Forms Photo 230 + 231 | |

| | | | |
|---|---|---|---|
| **Control #:** | 31 | **Evidence Box:** | 4 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | TDHC M4 | | |
| **Description:** | Seized per Warrant | Customer Loan Log (Blue) Chinese characters / language | |

| | | | |
|---|---|---|---|
| **Control #:** | 32 | **Evidence Box:** | 4 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant | Atm Journal Tape | |

| | | | |
|---|---|---|---|
| **Control #:** | 33 | **Evidence Box:** | 4 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant | Player File; Kim Ki Huran, Keung Chi Ming, Lin Shao Hua, Park Woi Young, Oh Sang Soo, Shi Xiao Wei, Im Wan Soon, Pan Qi Xiang #467 - 468, Huang Shun Di, Zhang De Jun | |

| | | | |
|---|---|---|---|
| **Control #:** | 34 | **Evidence Box:** | 5 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | B11 Shelf | | |
| **Description:** | Seized per Warrant | Player Files | |

| | | | |
|---|---|---|---|
| **Control #:** | 35 | **Evidence Box:** | 5 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant | Player file: Xiong Wagon, Cho Bup Sun, Lee Kyung YI, Chung suk Woo, Choi Su Bong | |

| | | |
|---|---|---|
| **Control #:** | 36 | **Evidence Box:** 5 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Shelf B11 | |
| **Description:** | Seized per Warrant | Junket Authorized Reps |

| | | |
|---|---|---|
| **Control #:** | 37 | **Evidence Box:** 5 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Desk B-5, Center Drawer | |
| **Description:** | Seized per Warrant | Brown Note book for Jynkets + Promissory Note records<br>Tinian Dynasty Folder Marked "Un-Redeemed CPV's" |

| | | |
|---|---|---|
| **Control #:** | 38 | **Evidence Box:** 5 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Desk B5 3rd Drawer Left Side Marked | |
| **Description:** | Seized per Warrant | Cashier Collection, gambling revenuew Saet Zong, Anti -<br>Money Laundering Procedures, Marianas Airfare records,<br>Daily Feestas, 1/30/2012, Gambling Revenue 4/2012,<br>Gambling Revenue 1/2012, Settlement sheet emails +<br>attachments re Chinese |

| | | |
|---|---|---|
| **Control #:** | 39 | **Evidence Box:** 5 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Desk of B5 Surface of Desk | |
| **Description:** | Seized per Warrant | LIst of Korean Credit, Yellow Not Junkets etc |

| | | |
|---|---|---|
| **Control #:** | 40 | **Evidence Box:** 5 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Shelf B11 | |
| **Description:** | Seized per Warrant | Player Files etc<br>Endo Tachaiyuko etc |

| | | |
|---|---|---|
| **Control #:** | 41 | **Evidence Box:** 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** |
| **Found:** | Shelf B11 | |
| **Description:** | Seized per Warrant | Currency in/out<br>Bolded entries reflect 10,000 |

| | | | |
|---|---|---|---|
| **Control #:** | 42 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | B2 Drawer 2nd | | |
| **Description:** | Seized per Warrant | Old pep for mini junkets folder<br>- Customs forms folder<br>Luck coin hunt promotion tokens etc | |

| | | | |
|---|---|---|---|
| **Control #:** | 43 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant | Outstanding check taken for collection | |

| | | | |
|---|---|---|---|
| **Control #:** | 44 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Shelf B11 | | |
| **Description:** | Seized per Warrant | Taxable Gambling winnings statements | |

| | | | |
|---|---|---|---|
| **Control #:** | 45 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Grey Desk B5 1st Drawer | | |
| **Description:** | Seized per Warrant | Status Report, transaction details, cashier collection, Junket program etc | |

| | | | |
|---|---|---|---|
| **Control #:** | 46 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Grey Desk B5 | | |
| **Description:** | Seized per Warrant | CPV reports, Junket Reports | |

| | | | |
|---|---|---|---|
| **Control #:** | 47 | **Evidence Box:** | 6 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Gray Desk B-5 2nd Drawer Marked Hurit | | |
| **Description:** | Seized per Warrant | CPV report 3-6-2012 - settlement stmt, green Notebook | |

| | | | |
|---|---|---|---|
| **Control #:** | 48 | **Evidence Box:** | 7 |
| **Location:** | Ext Cash cage<br>b<br>b | **Locator Code:** | |
| **Found:** | Grey Desk Surface | | |
| **Description:** | Seized per Warrant    Black Binders | | |

| | | | |
|---|---|---|---|
| **Control #:** | 49 | **Evidence Box:** | 8 |
| **Location:** | Int Surv Room | **Locator Code:** | |
| **Found:** | Inside inbox on top of first desk | | |
| **Description:** | Seized per Warrant    1 pg Doc titled "Daily Activities" (2-16-2013 - 2-17-2013_ | | |

| | | | |
|---|---|---|---|
| **Control #:** | 50 | **Evidence Box:** | 8 |
| **Location:** | Int Surv Room | **Locator Code:** | |
| **Found:** | On top of 2 file cabines @ center of room | | |
| **Description:** | Seized per Warrant    Daily Activities | | |

| | | | |
|---|---|---|---|
| **Control #:** | 51 | **Evidence Box:** | 8 |
| **Location:** | TT | **Locator Code:** | |
| **Found:** | 2nd File Cabinet | | |
| **Description:** | Seized per Warrant    Black Binder Labled Size A4<br>Yellow File Folder labled size A4<br>Misc Docs<br>Black CD case Nylon | | |

| | | | |
|---|---|---|---|
| **Control #:** | 52 | **Evidence Box:** | 8 |
| **Location:** | TT | **Locator Code:** | |
| **Found:** | On top of black shelf against wall | | |
| **Description:** | Seized per Warrant    Mis docs 2012 TDHC | | |

| | | | |
|---|---|---|---|
| **Control #:** | 53 | **Evidence Box:** | 8 |
| **Location:** | Exterior Chip Bank | **Locator Code:** | |
| **Found:** | Teller Window, Right Drawer Marked Pending | | |
| **Description:** | Seized per Warrant    Table Reports in Manilla Folder | | |

| | | | |
|---|---|---|---|
| **Control #:** | 54 | **Evidence Box:** | 8 |
| **Location:** | Exterior Chip Bank | **Locator Code:** | |
| **Found:** | Computer Counter surface | | |
| **Description:** | Seized per Warrant    1 Black chip log<br>1 red folder | | |

| | | | |
|---|---|---|---|
| **Control #:** | 55 | **Evidence Box:** | 8 |
| **Location:** | Exterior Chip Bank | **Locator Code:** | |
| **Found:** | Computer Counter Surface | | |
| **Description:** | Seized per Warrant    Chip Bank Binder | | |

| | | | |
|---|---|---|---|
| **Control #:** | 56 | **Evidence Box:** | 9 |
| **Location:** | Offices | **Locator Code:** | |
| **Found:** | Cabinet | | |
| **Description:** | Seized per Warrant | Casino daily revenue reports 2008, 2009, 2010, 2011 | |

| | | | |
|---|---|---|---|
| **Control #:** | 57 | **Evidence Box:** | 10 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 58 | **Evidence Box:** | 11 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 59 | **Evidence Box:** | 12 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 60 | **Evidence Box:** | 13 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 61 | **Evidence Box:** | 14 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Finaical Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 62 | **Evidence Box:** | 15 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 63 | **Evidence Box:** | 16 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| | | | |
|---|---|---|---|
| **Control #:** | 64 | **Evidence Box:** | 17 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 65 | | **Evidence Box:** | 18 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 66 | | **Evidence Box:** | 19 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 67 | | **Evidence Box:** | 20 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 68 | | **Evidence Box:** | 21 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 69 | | **Evidence Box:** | 22 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 70 | | **Evidence Box:** | 23 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 71 | | **Evidence Box:** | 24 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 72 | | **Evidence Box:** | 25 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 73 | | **Evidence Box:** | 26 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 74 | | **Evidence Box:** | 27 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 75 | | **Evidence Box:** | 28 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 76 | | **Evidence Box:** | 29 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 77 | | **Evidence Box:** | 30 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 78 | | **Evidence Box:** | 31 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 79 | | **Evidence Box:** | 32 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 80 | | **Evidence Box:** | 33 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 81 | | **Evidence Box:** | 34 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| **Control #:** | 82 | | **Evidence Box:** | 35 |
|---|---|---|---|---|
| **Location:** | File Room | | **Locator Code:** | |
| **Found:** | General | | | |
| **Description:** | Seized per Warrant | Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 83 | **Evidence Box:** | 36 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 84 | **Evidence Box:** | 37 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 85 | **Evidence Box:** | 38 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 86 | **Evidence Box:** | 39 |
| **Location:** | File Room | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 87 | **Evidence Box:** | 40 |
| **Location:** | Charlie Chang | **Locator Code:** | |
| **Found:** | Office Desk | | |
| **Description:** | Seized per Warrant  Form 103 CTRC | | |

| | | | |
|---|---|---|---|
| **Control #:** | 88 | **Evidence Box:** | 41 |
| **Location:** | Mr Liang Office | **Locator Code:** | |
| **Found:** | Shelf | | |
| **Description:** | Seized per Warrant  Forex Binder<br>Loan agreement<br>Junket Operator<br>Receipt Binder<br>Cash reciept Binder | | |

| | | | |
|---|---|---|---|
| **Control #:** | 89 | **Evidence Box:** | 42 |
| **Location:** | QQ | **Locator Code:** | |
| **Found:** | Beside cabinet | | |
| **Description:** | Seized per Warrant  Main Bank control sheets | | |

| | | | |
|---|---|---|---|
| **Control #:** | 90 | **Evidence Box:** | 42 |
| **Location:** | SS | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Annual corporation report | | |

| | | | |
|---|---|---|---|
| **Control #:** | 91 | **Evidence Box:** | 42 |
| **Location:** | QQ | **Locator Code:** | |
| **Found:** | Beside Cabinet | | |
| **Description:** | Seized per Warrant  Casino reveue report | | |

| | | | |
|---|---|---|---|
| **Control #:** | 92 | **Evidence Box:** | 42 |
| **Location:** | QQ | **Locator Code:** | |
| **Found:** | Beside Cabinet | | |
| **Description:** | Seized per Warrant  2008 CTR | | |

| | | | |
|---|---|---|---|
| **Control #:** | 93 | **Evidence Box:** | 43 |
| **Location:** | JJ Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Income Control Reports | | |

| | | | |
|---|---|---|---|
| **Control #:** | 94 | **Evidence Box:** | 44 |
| **Location:** | JJ Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Income Reports | | |

| | | | |
|---|---|---|---|
| **Control #:** | 95 | **Evidence Box:** | 45 |
| **Location:** | JJ Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Income Reports Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 96 | **Evidence Box:** | 46 |
| **Location:** | JJ Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Income Reports - Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 97 | **Evidence Box:** | 47 |
| **Location:** | Storage | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| | | | |
|---|---|---|---|
| **Control #:** | 98 | **Evidence Box:** | 48 |
| **Location:** | JJ Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant  Various Financial Records | | |

| **Control #:** | 99 | **Evidence Box:** | 49 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 100 | **Evidence Box:** | 50 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 101 | **Evidence Box:** | 51 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 102 | **Evidence Box:** | 52 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 103 | **Evidence Box:** | 53 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 104 | **Evidence Box:** | 54 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 105 | **Evidence Box:** | 55 |
|---|---|---|---|
| **Location:** | JJ | **Locator Code:** | |
| | Charlie Chang | | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| **Control #:** | 106 | **Evidence Box:** | 56 |
|---|---|---|---|
| **Location:** | Charlie Chang | **Locator Code:** | |
| **Found:** | General | | |
| **Description:** | Seized per Warrant | Various Financial Records | |

| Control #: | 107 | | Evidence Box: | 57 |
|---|---|---|---|---|
| Location: | Charlie Chang | | Locator Code: | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records | | |

| Control #: | 108 | | Evidence Box: | 58 |
|---|---|---|---|---|
| Location: | Charlie Chang | | Locator Code: | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records | | |

| Control #: | 109 | | Evidence Box: | 59 |
|---|---|---|---|---|
| Location: | Charlie Chang | | Locator Code: | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records | | |

| Control #: | 110 | | Evidence Box: | 60 |
|---|---|---|---|---|
| Location: | JJ | | Locator Code: | |
| | Charlie Chang | | | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records | | |

| Control #: | 111 | | Evidence Box: | 61 |
|---|---|---|---|---|
| Location: | Tim Blythe Office | | Locator Code: | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records - Combination | | |

| Control #: | 112 | | Evidence Box: | 61 |
|---|---|---|---|---|
| Location: | Desk | | Locator Code: | |
| Found: | General | | | |
| Description: | Seized per Warrant | Various Financial Records | | |

| Control #: | 113 | | Evidence Box: | |
|---|---|---|---|---|
| Location: | | | Locator Code: | |
| Found: | | | | |
| Description: | | Not Used | | |

| Control #: | 114 | | Evidence Box: | |
|---|---|---|---|---|
| Location: | | | Locator Code: | |
| Found: | | | | |
| Description: | | Not Used | | |

| | | | |
|---|---|---|---|
| **Control #:** | 115 | **Evidence Box:** | 62 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 250GD Harddrive taken from GTR Desk top | |

| | | | |
|---|---|---|---|
| **Control #:** | 116 | **Evidence Box:** | 62 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 48.8GB Harddrive - Taken from Lenovo Desk Top Model P4515 | |

| | | | |
|---|---|---|---|
| **Control #:** | 117 | **Evidence Box:** | 62 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of Harddrive taken from Lenovo computer SN#SS02886269 | |

| | | | |
|---|---|---|---|
| **Control #:** | 118 | **Evidence Box:** | 62 |
| **Location:** | Ext Cash cage b b | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 40GB Harddrive taken from Lenovo desktop SN SS02644922 | |

| | | | |
|---|---|---|---|
| **Control #:** | 119 | **Evidence Box:** | 62 |
| **Location:** | Exterior Chip Bank | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of Harddrive taken from ACER Model APFH-EP6310C | |

| | | | |
|---|---|---|---|
| **Control #:** | 120 | **Evidence Box:** | 63 |
| **Location:** | UU | **Locator Code:** | |
| **Found:** | 2 | | |
| **Description:** | Seized per Warrant | Image of harddrive taken from Lenovo Desktop - SN # SS02552243 | |

| | | | |
|---|---|---|---|
| **Control #:** | 121 | **Evidence Box:** | 63 |
| **Location:** | Offices | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 80 GB Harddrive taken from ACER desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 122 | **Evidence Box:** | 63 |
| **Location:** | Tim Blythe Office | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of harddrive taken from Lenovo Desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 123 | **Evidence Box:** | 63 |
| **Location:** | Charlie Chang | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of harddrive taken from Lenovo desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 124 | **Evidence Box:** | 63 |
| **Location:** | SS | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 160GB harddrive - taken from HKC desktop computer | |

| | | | |
|---|---|---|---|
| **Control #:** | 125 | **Evidence Box:** | 63 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 80 GB harddrive taken from Lenovo desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 126 | **Evidence Box:** | 63 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 80GB harddrive taken from Lenovo desk top | |

| | | | |
|---|---|---|---|
| **Control #:** | 127 | **Evidence Box:** | 63 |
| **Location:** | Office VIP | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 160GB harddrive taken from ACER Aspire T135 desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 128 | **Evidence Box:** | 63 |
| **Location:** | TT | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of 200GB harddrive - taken from ACER Aspire desktop | |

| | | | |
|---|---|---|---|
| **Control #:** | 129 | **Evidence Box:** | 63 |
| **Location:** | Money count room C | **Locator Code:** | |
| **Found:** | Computer | | |
| **Description:** | Seized per Warrant | Image of a harddrive taken from Generic desk top "legend" | |

| **Control #:** | 130 | | **Evidence Box:** | 63 |
| **Location:** | Int Surv Room | | **Locator Code:** | |
| **Found:** | Computer | | | |
| **Description:** | Seized per Warrant | Image of 160GB harddrive taken from Lenovo xenon 4363 server | | |

| **Control #:** | 131 | | **Evidence Box:** | 63 |
| **Location:** | Ext Cash cage b b | | **Locator Code:** | |
| **Found:** | Computer | | | |
| **Description:** | Seized per Warrant | Image of 320GB harddrive taken from Lenovo SL400 laptop | | |

| **Control #:** | 132 | | **Evidence Box:** | 63 |
| **Location:** | Mr Liang Office | | **Locator Code:** | |
| **Found:** | Computer | | | |
| **Description:** | Seized per Warrant | Image of Samsung harddrive taken from ACER desktop | | |

| **Control #:** | 133 | | **Evidence Box:** | 63 |
| **Location:** | Georg Que Office | | **Locator Code:** | |
| **Found:** | Computer | | | |
| **Description:** | Seized per Warrant | Image of harddrive taken from ACER Aspire desktop | | |

<u>AFFIDAVIT</u>

I, TODD PETERSON, being first duly sworn on oath, depose and say:

1.      I am a Special Agent with the Internal Revenue Service Criminal Investigation (hereafter referred to as "IRS-CI") and have been so employed since July 2001.  My official duties and responsibilities include the investigation of alleged criminal violations of the Internal Revenue laws and related offenses.  I have conducted and assisted in the investigation of suspected tax fraud, money laundering, and currency reporting violations.  I have also participated in the execution of many search warrants sought by and issued to myself and other special agents of the Internal Revenue Service, Criminal Investigation.

2.      I have successfully completed nine weeks of criminal investigative training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  My training included courses in law enforcement techniques, Federal criminal statutes, conducting criminal investigations, and the execution of search warrants.  I have also successfully completed a nine week Special Agent Basic Training course at the Federal Law Enforcement Training Center, which includes courses in financial investigative techniques, legal principles and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26 and 31.  I have attended Continuing Professional Education seminars and periodic training exercises throughout my career. In addition, I have attended a weeklong advanced training course in International Banking and Money Laundering at the Federal Law Enforcement Training Center.  I received a bachelor's degree in accounting and marketing/logistics in 2001.

3.     My federal criminal investigative experience has involved the use of consensual monitoring, surveillance, financial records analysis, interviews, and other investigative techniques.  Through the course of these investigations, I have also personally interviewed witnesses, informants, and persons arrested for white collar and other crimes.  I have spoken with more experienced investigators with whom I work concerning the practices of white collar and other criminals, and the best methods to use in the investigations of such individuals and organizations.  Through the course of my investigations and conversations with more experienced investigators, I have become familiar with the various types of evidence found during the searches of residences, businesses, vehicles and storage areas used by white collar and other criminals.

<u>Location to be Searched</u>

4.     I make this affidavit in support of the issuance of a search warrant for the Tinian Dynasty Hotel & Casino (hereafter referred to as "TDHC"), more particularly described in Attachment A, attached hereto and incorporated herein.  TDHC is currently owned and operated by a corporation named Hong Kong Entertainment (Overseas) Investments Limited ("HKEOIL"). In a Court Order from the U.S. Department of Labor Office of Administrative Law Judges, San Francisco, CA, the Tinian Dynasty Holding Company Ltd. is referred to as the "opaque entity which totally owns HKE."  In the same document, HKE is referred to as Hong Kong Entertainment (Overseas) Investments Ltd. dba Tinian Dynasty Hotel and Casino.  I am informed and allege that there exists probable cause to believe that now located at the TDHC business location is evidence and instrumentalities of criminal offenses against the United States, to wit

2

Title 18, United States Code, Section 371 (Conspiracy to Commit an Offense Against the United States), Title 31, United States Code, Sections 5313, 5324(a)(1), and (d)(2) (Causing a Financial Institution to Fail to File a Currency Transaction Report and/or a Suspicious Activity Report), and Title 31 United States Code Sections 5318(h), 5322 (Failure to Maintain an Effective Anti-Money Laundering Program).

5. The items to be seized are documents, records, and other evidence, as more particularly described in Attachment B, attached hereto and incorporated herein, which are maintained by TDHC for the period from January 1, 2008 through the present.

6. I am familiar with the information contained in this affidavit, either through personal knowledge or discussions with other law enforcement officers, government agencies, and Internal Revenue Service employees who have obtained information that they have reported to me, and publicly reported information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of securing a search warrant for the location described in Attachment A and a seizure warrant for the items described in Attachment B, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation for an order authorizing the search of the location described in Attachment A and seizure of the items described in Attachment.

## Statutory Authority

7. The Bank Secrecy Act ("BSA"), codified at Title 31, United States Code, Sections 5313-5326, is a set of laws and regulations enacted by Congress to address an increase in criminal money laundering through financial institutions.

3

8.     Title 31, United States Code, Section 5324(a) provides that: "No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508; - (1) cause or attempt to cause a domestic financial institution to fail to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508; (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) or 5325 or any regulation prescribed under any such section, to file a report or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508, that contains a material omission or misstatement of fact".

9.     Title 31, United States Code, Section 5313(a) provides that: "When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.  A participant acting for

another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made."

10.    The implementing regulations are contained in Title 31, Code of Federal Regulations, Part 103, which are now contained in Chapter X within the same Title effective March 1, 2011.

11.    The definition of a financial institution for the purposes of the BSA is defined in Title 31, Code of Federal Regulations, Section 1010.100(t) and includes "A casino or gambling casino that: Is duly licensed or authorized to do business as such in the United States, whether under the laws of a State or of a Territory or Insular Possession of the United States, or under the Indian Gaming Regulatory Act or other Federal, State, or tribal law or arrangement affecting Indian lands (including, without limitation, a casino operating on the assumption or under the view that no such authorization is required for casino operation on Indian lands), and has gross annual gaming revenue in excess of $1 million. The term includes the principal headquarters and every domestic branch or place of business of the casino. It is important to note that activities related, but separate, to the operation of a casino, such as a hotel or food and beverage services, do not fall under the definition of a "financial institution" for purposes of the Bank Secrecy Act.

12.    One of the BSA mechanisms to uncover criminal activity conducted through financial institutions is a requirement that casinos and other financial institutions file a "Currency Transaction Report for Casinos" (hereafter referred to as a "CTR"), FinCEN Form 103 or its electronic equivalent, with the Department of the Treasury, for any transaction involving more than $10,000 in U.S. currency.

5

13.    A CTR consists of three parts.  Part I requires the financial institution to verify and accurately record the name and address of the individual who conducted a reportable currency transaction, as well as to accurately record the identity, social security number, or taxpayer identification number of any person or entity on whose behalf the currency transaction was conducted.  Part II requires the financial institution to record the date, the amount of the transaction, and the form of the transaction.  Part III requires the name of the financial institution where the transaction occurred, the person completing the CTR, and the person approving the completion and filing of the CTR.  A CTR is required to be filed no later than the 15th calendar day after the day of the transaction.

14.    Title 31, United States Code, Section 5313(a) and related regulations, including Title 31, Code of Federal Regulations, Sections 1010.312 and 1021.312, require a financial institution to verify and record the name and address of the individual presenting a transaction, as well as record the identity, account number, and the social security number or taxpayer identification number, if any, of any person or entity on whose behalf such transaction is to be effected.  Verification of the identity of an individual who indicates that he or she is an alien or is not a resident of the United States must be made by passport, alien identification card, or other official document evidencing nationality or residence.  Verification of identity in any other case shall be made by examination of a document, other than a bank signature card, that is normally acceptable within the banking community as a means of identification for nondepositors. The specific identifying information used in verifying the identity of the customer shall be

6

recorded on the report, and the mere notation of "known customer" or "bank signature card on file" on the report is prohibited.

15.    Title 31, United States Code, Section 5313(a) and related regulations, including Title 31, Code of Federal Regulations, Sections 1010.980 and 1021.313, require that casinos treat multiple currency transactions as a single transaction and file a CTR if the financial institution has knowledge that the multiple transactions were by or on behalf of any person and resulted in either cash in or cash out totaling more than $10,000 (or an equivalent amount of foreign currency) during any one gaming day.

16.    Another BSA mechanism to uncover criminal activity conducted through financial institutions is a requirement that casinos, like other financial institutions, file a "Suspicious Activity Report by Casinos" (hereafter referred to as a "SAR"), or its equivalent, with the Department of the Treasury, for any suspicious transaction (as defined in Title 31, Code of Federal Regulations, Section 1021.320) no later than 30 calendar days after the date of the initial detection by the casino of facts that may constitute a basis for filing a SAR.

17.    In addition, Title 31, United States Code, Section 5318(h) and related regulations, including Title 31, Code of Federal Regulations, Section 1021.210, requires casinos to develop, implement, and maintain an effective anti-money laundering program reasonably designed to prevent the casino from being used to facilitate money laundering.

## Case Background

18a.    As part of my duties as a Special Agent, I have been assigned to investigate the activities of TDHC and its agents and employees to determine whether their activities constitute violations of federal laws, specifically Title 31. As set forth in detail below, in this investigation, I have found evidence indicating that employees and agents of TDHC have violated Title 18, United States Code, Section 371, Title 31, United States Code, Sections 5324(a)(1), (a)(2), and/or (d)(2), and Title 31, United States Code, Sections 5318(h), and 5322.

18b.    Title 18, United States Code, Section 371 and Title 31, United States Code, Sections 5318(h) and 5322 make it a crime to conspire to fail to maintain an effective anti-money laundering program. The elements of this offense are:

a.    There was an agreement between two or more persons to fail to maintain an effective anti-money laundering program;

b.    A defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

18c.    Title 31, United States Code, Sections 5318(h) and 5322 make it a crime to fail to maintain an effective anti-money laundering program. The elements of this offense are:

a.    TDHC operated as a casino or gambling casino and was a financial institution located in the CNMI, an insular possession of the United States;

b.    A defendant caused TDHC to fail to implement one or more of the following minimal requirements set forth by regulation by the Secretary of the Treasury:

1.    Have effective written policies, procedures and controls for one or more the following: (i) verifying customer identification; or (ii) filing

8

reports, such as currency transaction reports; or (iii) creating and retaining records; or (iv) responding to law enforcement requests;

2. Designate a person to assure day to day compliance with the anti-money laundering program, including assuring that: (i) the check cashier properly files reports, creates and retains records, in accordance with applicable requirements, such as filing currency transaction reports; and (ii) the program is updated as necessary to reflect new requirements; or

3. Provide education and/or training of appropriate personnel concerning their responsibilities under the program; and

c. A defendant acted willfully in failing to develop, implement, and maintain an effective anti-money laundering program.

18d.    Title 18, United States Code, Section 371 and Title 31, United States Code, Sections 5313, 5324(a)(1), and 5324(d)(2) make it a crime to conspire to cause or attempt to cause a domestic financial institution to fail to file a report under Section 5313(a) of Title 31 of the United States Code.  The elements of this offense are:

a. There was an agreement between two or more persons to cause or attempt to cause a domestic financial institution to fail to file a currency transaction report, as part of a pattern of illegal activity involving more than $100,000 in a 12-month period;

b. Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c. One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

18e.    Title 31, United States Code, Sections 5313, 5324(a)(1), and 5324(d)(2) make it a crime to cause or attempt to cause a domestic financial institution to fail to file a report - - i.e., a currency transaction report - - under Section 5313(a) of Title 31 of the United States Code.  The elements of this offense are:

a.    The defendant knew of the currency transaction reporting requirement;

b.    The defendant knowingly caused or attempted to cause a domestic financial institution to fail to file a currency transaction report, as part of a

9

pattern of illegal activity involving more than $100,000 in a 12-month period; and

c.    The defendant acted with the purpose to evade a transaction reporting requirement.

<u>Information Obtained from FinCEN Data and Bank Records</u>

19.    FinCEN is a bureau of the US Department of the Treasury and is responsible for the central collection, analysis, and dissemination of data reported under FinCEN's regulations and other related data in support of government and financial industry partners at the Federal, State, local, and international levels.

20.    According to FinCEN records, from 1998 until September 2009, TDHC routinely filed CTRs for reportable cash transactions it conducted with casino customers.  Since 1998, TDHC had filed approximately 6,789 CTRs.  On September 12, 2009, however, TDHC abruptly stopped filing CTRs with FinCEN.  According to FinCEN records, TDHC has never filed a SAR with FinCEN.

21.    FinCEN records show that TDHC uses two financial institutions to conduct its banking activities, the Bank of Saipan and the Bank of Guam.  CTRs are frequently filed by the Bank of Guam (Account No. ███3228 and Account No. ███8325) and the Bank of Saipan (Account No. ███2684 and Account No. ███2692) relating to transactions conducted by, or on behalf of, TDHC.  The bank accounts are held in the name of Hong Kong Entertainment (Overseas) Ltd. (Bank of Saipan) and Hongkong Entertainment Overseas Inv. (Bank of Guam).   The current bank account balances are unknown.  To protect the integrity of this investigation, the government will serve grand jury subpoenas to the banks requesting their account records upon execution of this search warrant.

10

22.     FinCEN Reports of International Transportation of Currency or Monetary Instruments (hereafter referred to as "CMIR") filed by (or on behalf of) TDHC show that the TDHC imported $7.9 million in US currency from China and Hong Kong in 2010 and 2011 and exported approximately $3.5 million in a mix of US currency, Japanese Yen, and South Korean Won during the same time period.  A CMIR is filed by an individual or business that transports, or causes the transportation of more than $10,000 in currency or other negotiable instruments into or out of the United States.

23.     TDHC registered with FinCEN on or about October 14, 2011 as a Money Service Business for "Currency Dealer or Exchanger" activities, which further demonstrates TDHC's familiarity with FinCEN regulatory requirements.

24.     During the investigation, agents obtained bank records relating to the financial activities of an individual with the initials "WX".  According to the bank records, WX is the owner of two companies, one in Saipan and one in Pohnpei, Federated States of Micronesia.  The bank inquired with WX to determine the purpose of many of his cash transactions.  As noted below, WX reported that he was conducting transactions at the TDHC casino.  The Bank of Guam filed CTRs for the cash transactions, but TDHC did not file any CTRs for the transactions identified by WX as having been conducted at the TDHC casino.  WX engaged in the following transactions:

| Date | Description of Transactions |
| --- | --- |
| 9/21/2009 | Deposit of $86,000 cash with notation "Won in a Black Jack Game at Tinian Dynasty" |
| 9/22/2009 | Deposit of $15,700 cash with notation "Winnings from Tinian Dynasty" |
| 9/24/2009 | Deposit of $58,000 cash with notation "Won at Tinian Dynasty" |
| 9/26/2009 | Withdrawal of $20,000 cash with notation "Casino purposes" |
| 11/5/2009 | Withdrawal of $25,000 cash with notation "Going to Tinian Dynasty to Play Black Jack" |

4/28/2010   Cash Deposit of $50,000 for unknown purpose
5/20/2010   Cash Withdrawal of $30,000 for unknown purpose
5/24/2010   Deposit of $80,000 Bank of Saipan Cashier's Check, which is the bank used by TDHC. The remitter is listed as WX, but WX may have purchased the cashier's check from TDHC funds. On the same date, three (3) Checks were negotiated from WX's account totaling $100,000 and payable to Hong Kong Entertainment (Overseas) Investment Ltd.

25.     Thomas Liu, the General Manager of the TDHC, and/or an individual believed to be Liu's wife (hereinafter referred to as "Liu's wife") have made frequent cash deposits into their joint personal bank account at First Hawaiian Bank totaling $111,500 since December 29, 2010. Two of the deposits were made by Liu's wife on December 29, 2010, and January 6, 2011, each in the amount of $9,500. One of the two deposits consisted solely of $100 bills. The teller asked Liu's wife for identification, but she told the teller that identification was not required to make a deposit and would not elaborate on the source of funds. These funds were subsequently transferred by check to an account at another bank controlled by Dianne Liu (unknown relation). Dianne Liu later transferred a majority of these funds to yet another bank account, ownership unknown. On January 12, 2012, another deposit of $22,000 was made by Liu's wife, all in $100 bills. These funds appear to have been used to pay off a $21,820.99 joint credit card balance, which consisted almost exclusively of purchases from the DFS Galleria (a duty free luxury goods retailer in Saipan).

26.     A company named "Tinian Dynasty Travel Co. Ltd." conducted several large cash transactions in conjunction with, or on behalf of, HKEOI. Tinian Dynasty Travel Co. Ltd. lists only a Hong Kong address without a US Employer ID Number. A vast majority of these transactions are also conducted in conjunction with Star Marianas Air, Inc., the charter airline flying between Saipan and Tinian. The CTRs involving Tinian

12

Dynasty Travel Company total $7,406,751 in "cash-in" transactions between May 20, 2011 and March 1, 2013. It is unusual for companies to make large cash transactions of this nature into accounts belonging to other corporations. The relationship between TDHC, Tinian Dynasty Travel Co. Ltd., and Star Marianas Air, Inc. is unknown.

<u>Information Obtained from Telephonic Undercover Operations</u>

27.     An IRS-CI undercover agent placed a consensually monitored telephone call on May 3, 2012. The undercover agent initially contacted Saipan Travel. Saipan Travel referred the undercover agent to the TDHC where the undercover agent eventually made contact with George Que (hereafter referred to as "Que"), who referred to himself as the "VIP Services Manager" at the TDHC. The undercover agent advised Que that the Russian businessman he was representing wanted to bring large amounts of currency to the TDHC, but he did not want any paperwork filed as a result of using this currency to gamble. Que assured the undercover agent that paperwork relating to the use of large amounts of currency would not be filed by the TDHC. The undercover agent asked Que if he understood the type of paperwork that he was referring, to which Que stated that he did. Que did advise the undercover agent that the currency should be reported to CNMI Customs at the Saipan airport, but that was the only form that would need to be filed.

28.     A second consensually monitored telephone call was placed by the undercover agent on September 11, 2012. The undercover agent again contacted George Que and inquired about the pending change in TDHC's ownership. Que responded that TDHC's previous policies would remain largely unchanged and that the staff and upper management would remain at the TDHC, despite the change in

13

ownership. Que assured the undercover agent that there was nothing to worry about relating to the undercover agent's desire to conduct large cash transactions without any paperwork being created. Que confirmed that he recalled the previous conversation with the undercover agent.

Information Obtained from In-Person Undercover Operations

29.     Two IRS-CI undercover agents made three in-person visits to the TDHC on February 28, 2013, March 2, 2013, and March 4, 2013.

30.     On February 28, 2013, the two undercover agents traveled to the TDHC and met with George Que, who identified himself as the "VIP Services Manager". Before conducting any transactions, Que told the undercover agents that they could cash in their casino chips and receive a casino check or wire transfer at the conclusion of their gambling activities. Que assisted the undercover agents in purchasing two TDHC "vouchers" at the casino cashier cage. One undercover agent (hereafter "UCA-1") purchased a voucher with $30,000 in US currency, while the second undercover agent (hereafter "UCA-2") purchased a voucher with $15,000 in US currency. However, at the request of the undercover agents, both vouchers were made in the name of UCA-2, even though it was made apparent that the funds were from two separate individuals. Two CTRs were required by law to be filed by TDHC for the $30,000 and $15,000 cash transactions, including the name of the person actually conducting the transaction and the person on whose behalf the transaction was conducted (if different from the transactor). Both vouchers were later used by the undercover agents to receive an equivalent value of casino chips from Que at a blackjack table within the casino. After playing blackjack, the undercover agents exchanged their remaining chips with Que for

14

two vouchers, in the amount of $30,000 and $11,500 for UCA-1 and UCA-2, respectively.  Both vouchers were again made in the name of UCA-2.

31.     Following lunch, UCA-1 independently purchased an additional voucher in the name of UCA-2 with $40,000 in US currency.  George Que later brought an equivalent amount of TDHC casino chips to the blackjack table.  One CTR was required by law to be filed by TDHC for the $40,000 cash transaction, including the identities of both UCA-1 and UCA-2.  At the end of this session of blackjack, Que informed the undercover agents that the casino would be unable to redeem the vouchers and/or casino chips for a casino check due to the unavailability of one of the two signers needed to sign a TDHC check.  Que suggested that the undercover agents instead exchange their casino chips for a voucher, which could then be exchanged for a casino check on their next visit.  Que then exchanged their two vouchers (for $30,000 and $11,500) and $35,000 in TDHC casino chips for a $60,000 voucher in UCA-1's name and $16,500 in US currency.  One CTR was required by law to be filed by TDHC for the $16,500 cash transaction, including the identities of UCA-1 and UCA-2.

32.     During the visit on February 28, 2013, George Que discussed a pending sale of the casino to Howarm (referring to a possible, but apparently not imminent, sale of the TDHC to Howarm Construction of Taiwan) and confirmed that the sale had not been completed.  Que stated that the new owner was not taking 100% interest in the TDHC, but that the new owner would be a majority owner.  Que identified Mr. Kwan as the "Chairman" of the TDHC, Tom Liu as the General Manager of the TDHC, and Tim Blythe as the Casino Manager of the TDHC.  Que told the undercover agents that the casino is the main source of TDHC's revenue and that the gaming revenue pays the

15

bills. Que stated that he saw a TDHC customer lose $2 million from a TDHC credit line over the span of a few days. UCA-2 asked Que, "I'm sure you see that sometimes, too, just coming in with a big briefcase full of cash", to which Que responded "Yeah, a few hundred thousand sometimes. The Japanese." Que also confirmed to the undercover agents that the CNMI is subject to federal law and that federal law supersedes local law. Que also referenced the reporting requirements for individuals departing the CNMI with over $10,000 in US currency, and mentioned that TDHC has assisted its customers "hundreds of times" with filling out the customs form. The fact that the TDHC is aware that those customers are often carrying in excess of $10,000 of US currency (or its foreign equivalent) strongly suggests that the customer received in excess of $10,000 in US currency (or its foreign equivalent) directly from TDHC.

33.     On March 2, 2013, the two undercover agents again traveled to the TDHC and met with George Que. UCA-1 purchased a voucher for $60,000 in US currency under UCA-2's name at the cashier cage, even though it was made clear that the funds came from UCA-1. In separate transactions, UCA-2 purchased two additional vouchers for $20,000 each in US currency under his own name at the cashier cage. Que assisted UCA-2 with one of the $20,000 cash transactions. One CTR was required by law to be filed by TDHC for the $60,000 transaction (identifying both UCA-1 and UCA-2) and another CTR for the $40,000 transaction for UCA-2 (the aggregate of the two $20,000 cash transactions).

34.     During the visit on March 2, 2013, George Que advised the undercover agents that the undercover agents would not be able to receive a TDHC casino check, but that it is something they might be able to do once a relationship was established.

16

Tim Blythe (hereinafter referred as to "Blythe"), who represented himself as the Casino Manager, confirmed that the TDHC would not issue a check in exchange for the casino chips and/or vouchers, but agreed that the undercover agents can receive the funds via wire transfer.  Blythe discussed the currency reporting requirements that apply to financial institutions if the undercover agents deposited their cash at the Bank of Guam.  Blythe also commented that structuring transactions into $9,900 transactions is also illegal.  Blythe confirmed that the currency reporting requirements apply to the TDHC and that a report might have already been filed for the $16,500 cash the undercover agents received on February 28, 2013.  Blythe stated that TDHC files several reports each day with the "local finance office" but was unsure exactly where the reports were actually filed or what happens to them after they are filed.  (According to BSA regulations, casinos are required to file the reports directly with FinCEN, and therefore filing these reports with any local office does not comply with BSA regulations absent specific authorization from FinCEN.)  Blythe and Que both commented that TDHC could not force a customer to provide their name and would therefore file reports based solely on a general description of the person.  Blythe also stated that the Tinian Gambling Commission has about 20 employees, with at least two Commission employees at the casino at all times.  The Tinian Gambling Commission, among other duties, reviews TDHC's financial records.

35.    Tim Blythe stated that it is not unusual for customers to bring with them $100,000 or more in cash to the TDHC.  George Que and Blythe also discussed the minimum buy-in and maximum bet limits for the VIP rooms at the back of the casino.  They explained that the minimum buy-in is $1 million and the maximum bet is $80,000.

17

36.    At the end of the undercover agents' visit on March 2, 2013, the undercover agents exchanged their TDHC casino chips for vouchers.  UCA-1 received a $46,250 voucher in UCA-2's name and kept $20,000 in TDHC casino chips.  UCA-2 received a $25,000 voucher and kept $20,200 in TDHC casino chips.

37.    On March 4, 2013, the undercover agents traveled a third time to the TDHC. UCA-2 began playing baccarat with the $20,200 in TDHC casino chips from the previous visit.  UCA-1 later joined UCA-2 at a blackjack table.  UCA-1 cashed in $20,000 in US currency and had $12,000 in TDHC casino chips from the previous visit. One CTR was required by law to be filed by TDHC for the $20,000 cash transaction conducted by UCA-1.

38.    On March 4, 2013, George Que suggested to the undercover agents that asking the questions about the currency transaction reports made Blythe uncomfortable, but assured them that the only report that might be filed by the back office would be relating to their $16,500 cash out transaction on February 28, 2013.  Que again mentioned that they file reports on cash out transactions over $10,000 every day for anybody.  Que also volunteered that UCA-1 is clean except for the $16,500 transaction and that the copy of his driver's license had been "disposed of," so that TDHC does not have the information necessary to file reports relating to his transactions.  Que and the undercover agents discussed a Chinese gentleman that UCA-2 saw carrying an estimated 12-inch stack of currency near the casino cashier.  UCA-2 asked Que if this much currency caused any problems or issues, to which Que responded that it does not cause any problems.  Que stated that the chairman of HKEOI, Mr. Kwan, will remain a partial owner of TDHC even after the sale to Howarm is completed.

18

39.     Later on March 4, 2013, Tim Blythe again met with the undercover agents and notified them that they will not issue a casino check and that the chairman of the TDHC would not sign off on a wire transfer to the undercover agents for anything other than their winnings.  If the undercover agents had initially wired their funds to the casino, the casino would wire back all of the funds to them after their play.   Blythe reiterated that they are highly regulated by the Tinian Gambling Commission and the Federal Government, and that any cash transaction over $10,000 would cause a currency transaction report to be filed.  Blythe added that the procedures are there for a reason and that he "can't ask his employees to do anything illegal."  The undercover agents stated on multiple occasions that they were not asking TDHC to do anything illegal and wanted TDHC to follow their normal procedure to avoid raising any red flags. At Blythe's direction, the undercover agents had to receive their remaining funds entirely in US currency, which would necessarily require the filing of a CTR.

40.     At the end of the undercover agents' visit on March 4, 2013, the undercover agents exchanged their TDHC casino chips and vouchers for a total of $228,630 in US currency.  UCA-1 received $148,150 in US currency in exchange for a $46,250 voucher in UCA-2's name, a $60,000 voucher in UCA-1's name, and the remainder in TDHC casino chips.  UCA-2 received $55,480 in US currency for his TDHC casino chips and in a separate transaction, received $25,000 in US currency for a TDHC voucher.  One CTR was required by law to be filed by TDHC for the $148,150 cash transaction and another CTR for $80,480 transaction for UCA-2 (the aggregate of the $55,480 and $25,000 cash transactions).

19

41.    The cash-out process on March 4, 2013, took about 45 minutes as the casino cashiers had to receive approvals by telephone before cashing the vouchers.  This process alerted additional casino staff to the large cash transactions and provided ample time for TDHC staff to request identifying information and/or prepare CTRs relating to these transactions.  In addition, the casino provided a shopping bag for the undercover agents to carry their cash, further demonstrating their direct knowledge of the amount of cash they were receiving.

42.    A small sign is displayed at the TDHC cashier cage window detailing the CMIR filing requirements.  This further demonstrates TDHC's knowledge of the BSA filing requirements.

43.    Based on the conversations and representations made by the undercover agents to TDHC employees and management in conjunction with their cash transactions, TDHC was required by law to file at least one Suspicious Activity Report.

44.    To date, TDHC has failed to file with FinCEN any CTR(s) or SAR(s) relating to any of the cash transactions conducted by the undercover agents on February 28, 2013, March 2, 2013, or March 4, 2013.

### Estimated Unreported TDHC Currency Transaction Reports

45.    TDHC filed frequent CTRs through August, 2009 (and two reports in September, 2009).  For the period from January 2007 through September, 2009, TDHC filed a total of 1,916 CTRs, or an average of 58 reports per month.  The total amount of reportable cash-in transactions during this period was $25,114,002 and reportable cash out transactions during this period was $43,690,410.  The reports were filed in the following amounts:

20

| Year | Reports | Cash In | Cash Out |
|------|---------|---------|----------|
| 2007 | 852 | $9,875,081.00 | $21,083,470.00 |
| 2008 | 656 | $9,721,757.00 | $14,490,600.00 |
| 2009 | 408 | $5,517,164.00 | $8,099,740.00 |

46.    It is difficult, if not impossible, to accurately calculate the exact number or dollar amounts of CTRs that TDHC failed to file for cash transactions conducted for the period from October, 2009 through March, 2013 without obtaining TDHC's own business records.  However, an analysis of the previous CTR filings made by TDHC provides a reasonable basis to estimate the number of forms TDHC failed to file and the total amount of cash transactions it failed to report.

47.    Based on an analysis of TDHC's CTR filing history, it appears that the period from February, 2009 to September, 2009 would provide the most relevant "baseline" from which to extrapolate TDHC's potential non-filed CTRs.  In addition, using this most recent data provides a more conservative estimate, since the average CTR filings in 2009 are less than 2007 or 2008 on an absolute or average basis.  January, 2009 was excluded from the calculations, as TDHC failed to file any CTRs in that month.  This "baseline" indicates that TDHC filed an average 51 reports per month, with an average reportable cash in of $689,645.50 per month and an average reportable cash out of $1,014,542.50 per month.

48.    Using the CTR data for reports filed by TDHC for the period from February 1, 2009 through September 30, 2009 as a baseline, TDHC would be expected to file 2,142 CTRs for the period from October 2009 through March, 2013, reporting cash-in of $28,965,111.00 and cash-out of $42,610,785.00.

21

49.   This extrapolation is supported by an analysis of the CTR filings made by the Bank of Guam and Bank of Saipan for reportable cash transactions conducted by TDHC relative to Bank of Guam accounts ████8325 and ████3228 and Bank of Saipan accounts ████2692 and ████2684, as well as others.  These CTRs do not show TDHC's source of funds.  However, there is probable cause to believe that funds in the accounts are from the operation of the casino.  All four of these accounts involve large cash transactions.  Also, during the undercover operation, George Que told undercover agents that the casino is TDHC's main source of revenue and that the gaming revenue pays the bills.

50.   The analysis of the CTR filings by the Bank of Guam and Bank of Saipan further shows that TDHC's own large cash transaction activity remained relatively consistent after September 2009 (when TDHC ceased filing CTRs for cash transactions with TDHC customers).  In fact, 2012 saw increased reportable cash deposits by TDHC over the years 2007-2011.  The reportable cash-in amounts by year are as follows:

| | |
|------|-----------------|
| 2007 | $4,910,639.00 |
| 2008 | $6,608,579.00 |
| 2009 | $6,344,234.00 |
| 2010 | $6,800,679.00 |
| 2011 | $5,971,825.00 |
| 2012 | $11,628,334.00 |

TDHC's higher reportable cash deposits in 2012 provide a reasonable indication that casino revenue did not decline after September 2009 and that the form of customer

transactions has not changed significantly from cash to other forms of payment that might explain the sudden cessation of CTR filings by TDHC.

<u>Additional Financial Analysis</u>

51.    Based upon my training and experience, businesses typically deposit at least a portion of their daily receipts into their business bank accounts on a regular basis.  As such, it is likely that at least a portion of the cash received from cash transactions in which a CTR was required to be filed would be deposited into TDHC's business bank accounts.

52.    The CTR filings by TDHC, Bank of Guam, and Bank of Saipan seem to indicate that TDHC was extremely cash negative.  For instance, between January, 2007 and September, 2009, TDHC filed cash-out CTR's of $43,690,410 and cash-in CTRs of $25,114,002.00, resulting in net cash out of $18,576,408.00 from reportable cash transactions.  During the same period, TDHC deposited into its own bank accounts $16,038,931.00 in reportable cash transactions and withdrew only $2,779,610.00 in reportable cash transactions, resulting in a net cash "outflow" of $13,259,371.00.  Taken together, TDHC disbursed in currency $31,831,179.00 more than it received in reportable transactions.  This massive amount of outgoing cash, without an apparent corresponding legitimate source, seems to indicate that TDHC was either under-reporting its reportable cash receipts (when it was still filing CTRs), or is receiving large amounts of cash through other means that have not been identified.

53.    Newspaper articles report that TDHC has been struggling financially.  On April 3, 2013, the Marianas Variety newspaper reported that TDHC has failed to pay employee wages for the six pay periods since January 2013.  A Saipan Tribune July 5,

2012 article reported that HKEOIL settled a $30 million tax bill owed to the CNMI government for $6.1 million, as part of the negotiation to sell the TDHC to Howarm.

<u>Evidence That Business Records Are Located At TDHC Location</u>

54.     Based on my training and experience, businesses invariably maintain records pertaining to their business activities at their business location.

55.     The undercover agents were required to sign vouchers for each cash-in transaction.  These vouchers contained the name of the (reported) customer, the amount, and the nature of the transaction.

56.     The BSA requires casinos (and other financial institutions) to maintain a wide range of supporting documents, as detailed in Title 31, Code of Federal Regulations, Sections 1021.400 and 1021.410.  One such requirement is to maintain "all records which are prepared or used by a casino to monitor a customer's gaming activity".

57.     In addition, TDHC, like most casinos, uses a VIP tracking system to award complimentary items (food, hotel rooms, etc.) to its best customers.  These records typically include a detailed history of a tracked player's buy-ins, cash outs, average bet, amounts won/lost, casino credit/marker information, and biographical information for each player.

58.     Based on my training and experience, the records pertaining to transactions and TDHC customers would remain at TDHC even if the proposed sale by HKEOIL to Howarm occurs.  Also, as noted above in Paragraph 28, George Que of TDHC told an undercover agent that if there were a change in ownership, TDHC's policies, staff, and upper management would remain largely the same.

24

<u>Necessity for Search Warrant</u>

59.    Based on the deliberate actions undertaken by George Que, Timothy Blythe, and possibly other TDHC employees to cause TDHC to fail to file CTR(s) or SAR(s) concerning the transactions of the two undercover agents, the lack of any CTR filings since September 2009, and the lack of any SAR filings in TDHC's existence, it is highly likely that other methods of evidence collection, such as the issuance of grand jury subpoenas, would not result in the production of true and accurate business records.

<u>Computer and/or Electronic Data</u>

60.    Based upon my experience in investigating individuals and businesses, as well as my consultation with more senior and experienced special agents, I know that computers are used extensively.  In particular, they are commonly used to:

    a.  Maintain books and records;

    b.  Prepare internal reports and analyses;

    c.  Prepare, transmit, and receive correspondences;

    d.  Prepare and transmit tax returns.

I believe in this particular case, computers were used for the same purposes.  For instance, TDHC used computers to generate vouchers for the undercover agents' cash transactions in excess of $10,000.

61.    Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers and electronic storage media as described in Attachment B and at the location described with particularity in Attachment A.

25

62.     I have consulted with several IRS-Criminal Investigation Computer Investigative Specialists regarding the aspects of properly retrieving and analyzing electronically stored computer data.  In addition to attending training in financial investigation techniques and accounting, they have also attended the IRS-CI Seized Computer Evidence Recovery School (BCERT) at the Federal Law Enforcement Training Center in Glynco, Georgia, where they learned about the operation of computer systems and the correct procedures for seizure and analysis of computer systems.

63.     Based on their knowledge, training, and experience, the Computer Investigative Specialists have advised me that properly retrieving and analyzing all electronic stored (computer) data, documenting and authenticating such data, and preventing the loss of data either from accidental or deliberate programmed destruction, requires on-site and laboratory analysis by a qualified computer specialist.  To effect such accuracy and completeness may require the seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords and decryption keys), and related instruction manuals which contain directions concerning the operation of the computer system and software programs.  This is because the peripheral devices, which allow users to enter or retrieve data from storage devices, vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output devices in order to read the data on the system.  It may be important that the computer system be re-configurable to accurately retrieve the evidence.

64.     Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment.  There are so many types of computer

26

hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

65.    I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. As many devices commonly found in a business may contain digital data, I will make every reasonable effort to minimize seizures to only those devices for which there is reason to believe might be found: evidence or fruits of the aforementioned crimes; contraband implicated by this affidavit; and property/instrumentalities designed for use, intended for use, or used in the commission of the aforementioned crimes.

66.    If personnel trained in the forensic preview of digital evidence are available, and if doing so will not extend the duration of the search to an unreasonable time, I intend for there to be an on-scene preview of the digital evidence in order to minimize the amount of material that needs to be removed from the premises. I know that certain tools are available to trained personnel that make such previews possible under certain circumstances. These previews are done in a manner that preserves the integrity of the data on the device. A forensic preview is not a substitute for a forensic examination, but in certain instances (such as when it is possible through interviews to determine which items belong to uninvolved third parties), an on-site forensic preview can be a useful tool in minimizing the number of digital devices that need to be removed from the premises for a full forensic examination. If an item that may reasonably contain

27

evidence of the aforementioned crimes cannot be eliminated from suspicion, I intend to remove it to a laboratory setting for a more detailed forensic examination in accordance with the parameters described below.

67.   With rare exception, search techniques will not be performed on original digital evidence.  Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized.  As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

68.   I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media.  Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media.  In general, the data contained on the original media is run through a hashing algorithm, and a hash value for the entire device is generated.  Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original.  Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

69.   In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

70.   I also hereby request judicial authorization to retain copies of all seized storage media after the review is complete.  Criminal Procedure Rule 41 specifically

28

states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41(f)(1)(B).

71. Judicial authorization is justified in this case in part because:

a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

c. The investigation is not yet complete; it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned

storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

e. Similarly, should a defendant suggest an explanation or some defense for the presence of evidence on storage media, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage media with that explanation or defense in mind. This may require an additional examination of the storage media for evidence that is described in Attachment B but was not properly identified and segregated previously.

72. Based upon my training, experience and information related to me by other special agents, I know that people who use computers often keep tax preparation records and other financial information on their computer hard drives and/or data storage devices.

73. The information provided in this affidavit is supported by my training, experience, education, and participation in this and other financial investigations. From my background, I generally know that:

a. Individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons;

b. Individuals and businesses normally maintain records of their financial activity, such as receipts for expenditures made by cash and check, bank records, and other financial documents;

30

c. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (i.e. financial, credit card, and banking statements, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and pager bills, keys to safe deposit boxes and rental storage lockers and computer hardware and software), but have significance and relevance when considered in light of other evidence. Furthermore, the evidence may be highly valuable to the offender or have high utility of legal applications, such as valuable personal property (i.e. art, jewelry, precious metals and stones, real estate, securities), large sums of U.S. currency, safes, firearms, communications equipment, vessels, and computer equipment. The criminal offender may no longer realize that he/she still possesses the evidence or believe that law enforcement could obtain a search warrant to seize the evidence;

d. Computers are used extensively by individuals and businesses of all sizes. Computers are commonly used to maintain any and all business records, to include correspondence, receipt records, payment records, employee timesheets, financial statements, accounting records, and employee contact information.

## Request for Sealing

74.    I respectfully request that this affidavit, the application for search warrant, the search warrant, and all attachments and exhibits, and other associated court records be sealed until further order of the Court.

## Conclusions

75.    As set forth in this affidavit, I submit that there is probable cause to believe that books and records which are evidence of violations of Title 18, United States Code, Section 371, Title 31, United States Code, Sections 5324(a)(1), and (d)(2) and Title 31, United States Code, Sections 5318(h), and 5322 are maintained at the business location of TDHC.

76.    Based upon the foregoing, I respectfully request that a search warrant be issued for the premises more particularly described in Attachment A, attached hereto and fully incorporated herein, for evidence and instrumentalities more particularly described in Attachment B, attached hereto and fully incorporated herein.


TODD M. PETERSON
Special Agent, IRS

32

## ATTACHMENT A – LOCATION TO BE SEARCHED

The premises to be searched shall include the offices and business area of the Tinian Dynasty Hotel and Casino, located at One Broadway, Tinian, Commonwealth of the Northern Marianas Islands, including the entire casino area, the casino floor, the casino cashier/cage, casino offices, cash count rooms, casino record storage areas, computer server areas, VIP gaming areas, Tinian Gaming Commission co-located workspace, and any other area where TDHC employees or Tinian Gaming Commission staff indicate that relevant records may be located.  The main building is approximately six stories tall with a large circular (non-operating) fountain near the front entrance. This search warrant does not authorize the search of guest hotel rooms or employee living areas.



## **ATTACHMENT B – ITEMS TO BE SEIZED**

The evidence sought herein is limited to documents and things created between January 1, 2008 and the present and relating to the following entities:

> Tinian Dynasty Hotel & Casino
> Hong Kong Entertainment (Overseas) Investments Limited
> Tinian Dynasty Holding Company Ltd.
> Tinian Dynasty Travel Company Ltd.

The following types of documents and/or things may be seized:

1. All records pertaining to cash transactions or wagers
2. All records and correspondence pertaining to casino customers, their contact information, gambling activity, source of income, and their financial transactions
3. All records relating to "junkets" (arrangement in which a casino pays an individual commissions based on the wagers placed by customers they bring to the casino)
4. All records pertaining to any prepared and/or filed Currency Transaction Reports, Suspicious Activity Reports, or Reports of International Transportation of Currency or Monetary Instruments, or any other record reporting similar information
5. All records relating to the casino's anti-money laundering program
6. All correspondence with/from/to the Tinian Gaming Commission, Internal Revenue Service, FinCEN, or other regulator regarding cash transactions, money laundering, anti-money laundering programs, Bank Secrecy Act, or other regulatory requirements and/or reporting
7. All records relating to any audits, examinations, or other compliance activity relating to the casino operation
8. All records pertaining to the approval or denial by any governmental agency to operate a casino or other gambling operation
9. All records that relate to the ownership structure and/or owners of the casino or corporation(s)
10. All records pertaining to any pending, negotiated, tentative, or final sale of the casino, including terms of the sale, structure of the sale, representations, method(s) of payment, and contingencies
11. All banking records including deposit slips, withdrawal slips, wire transfer confirmations, and casino checks
12. All records pertaining to the gross revenue, income, and/or expenses of the casino
13. All records identifying current and previous employees, management officials, officers, or other individuals involved in the operation of the casino
14. All employee records including applications for employment, contact information, time sheets, time cards, work schedules, wages paid, taxes withheld, references, and resumes;
15. All records relating to advances, loans, or markers made to casino patrons, to include source of funds, financial statements and records of repayment

16. All records relating to amounts received or disbursed by subsidiaries, travel agencies, or other companies that receive/disburse funds on behalf of casino patrons for gambling purposes at the Tinian Dynasty Hotel & Casino

17. All records that identify the relationship between the Tinian Dynasty Hotel & Casino and subsidiaries, corporate parents, travel agencies, or other companies that receive/disburse funds on behalf of casino patrons.

18. All records relating to the payment of wagering taxes, licensing fees, or any other taxes and fees to the CNMI government, Internal Revenue Service, Tinian Casino Gambling Commission, or the Tinian government.

19. All records of fees, commissions, tournament entry fees, or other monies retained from wagers or paid by customers to take part in any gambling activity, poker, or other games of chance or skill;

20. All property records, lease agreements, or other documents that indicate ownership or control of the Tinian Dynasty Hotel & Casino

21. All bookkeeping records and other financial records including trial balances, general ledgers, general journals, subsidiary ledgers and journals, disbursement records and/or journals, accounts payable ledgers and records, payroll records, loan receivable and payable ledgers, cash receipt and/or disbursement journals, and workpapers used to prepare any of the above;

22. Any of the above listed documents and records stored on computer readable magnetic storage media including removable tapes, disks, and hard disk storage drives permanently installed in computer hardware. The agents are authorized to seize all computer hardware and software (and related instruction manuals) and remove them to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover the files and records described in paragraphs 1-21 above. If, after the examination and analysis, it is determined that these items are no longer necessary to retrieve and preserve the data evidence, and they are determined not to be instrumentalities of a crime, they will be returned in a reasonable time.